IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge John L. Kane

Civil Action No. **99-cv-02462-JLK**

**DAWN DILLON,**

    Plaintiff,

v.

**TWIN PEAKS CHARTER ACADEMY and ST. VRAIN VALLEY SCHOOL DISTRICT NO. RE-1J,**

    Defendants.

## ORDER

Kane, J.

    This case is one of two related disputes involving employees of Twin Peaks Charter Academy and their claims that Defendants, *inter alia*, violated their rights of free speech and association by prohibiting them from meeting to discuss school matters off campus and otherwise retaliating against them. Other claims for breach of contract, deprivation of due process and promissory estoppel have previously been rejected. The cases are before me on remand after the Tenth Circuit Court of Appeals affirmed in part and reversed in part my rulings granting Defendants' Motions for Summary Judgment on all of Plaintiffs' claims. *See Brammer-Hoelter v. Twin Peaks Charter Academy*, 492 F.3d 1192 (10th Cir. 2007) and *Dillon v. Twin Peaks Charter Academy*, 2007 WL 2007549 (10th Cir. July 12, 2007)(unpublished decision).

    With regard to Dawn Dillon, a former paraprofessional employed by Twin Peaks

Charter Academy who filed suit after her contract was not renewed, the Tenth Circuit upheld my rejection of her due process and state common law claims, determined certain of Dillon's First Amendment freedom of speech and freedom of association retaliation theories of relief survived summary judgment and remanded the case for consideration of (1) Dillon's additional First Amendment prior restraint theory of relief and (2) Defendants' assertions of nonliability for any First Amendment violations under 42 U.S.C. § 1983 and *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978)(defining parameters of municipal liability under § 1983). Order and Judgment, slip op. at 17. After inviting supplemental briefing on summary judgment and hearing oral argument, I GRANT the District's Supplemental Motion for Summary Judgment (Doc. 57) and GRANT in part and DENY in part the Supplemental Motion of Academy (Doc. 56).

1. "Prior Restraint" as additional theory of constitutional deprivation.

Before proceeding to the Academy and District's assertions of nonliability under 42 U.S.C. § 1983, I consider Dillon's claim that the Academy's actions – either by virtue of Dr. Marlatt's directives against meeting and discussing school matters with other staff members or the Academy's Code of Conduct prohibiting certain categories of employee speech – offend the First Amendment for the additional reason that they constitute a prior restraint. I find they do not.

As the Tenth Circuit noted in both its opinion in the Brammer-Hoelter case and its Order and Judgment here, a prior restraint claim is separate and distinct from a freedom of speech or association retaliation theory of relief because a prior restraint chills

2

protected speech before it happens. *See Brammer-Hoelter*, 492 F.3d at 1209 *and* Order and Judgment, slip op at 11 (both citing *United States v. Nat'l Treas. Employees Union ("NTEU")*, 513 U.S. 454, 468 (1995) and *Arndt v. Koby*, 309 F.3d 1247, 1251 (10th 2002)). Generally, the threshold inquiry in analyzing the constitutionality of any governmental restriction on employee speech is whether the particular speech at issue was on a matter of public concern. *Arndt* at 1252 (applying *NTEU* and the balancing test articulated in *Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968)). If it is not, no constitutional injury flows from the prohibition. Here, however, it is unclear that Dillon's speech was ever actually "restricted," obviously a precursor to any inquiry under the First Amendment, and it is on that basis that the Academy moves for summary judgment.

For purposes of summary judgment, it is undisputed that Dillon, a paraprofessional, was not present at any of the teacher meetings where Dr. Marlatt issued her offending directives against meeting or discussing school matters. Instead, Dillon claims Marlatt warned her on one occasion to avoid "gossiping," and admits she was never ordered or directed by anyone else not to associate or speak with staff members about school matters or anything else. (Dillon Dep. p. 26 - 27.) Moreover, Dillon concedes she did not interpret Dr. Marlatt's warning as restricting her right to express herself. *See id.* Under these facts alone, it is difficult to see how Dillon can assert a successful claim for prior restraint. She simply has no evidentiary basis to support the existence of a governmental "restriction" on her speech, protected or otherwise.

Moreover, a single verbal warning against "gossiping" is insufficient as a matter of

law to support a basis for prior restraint under *NTEU* or *Arndt*. *NTEU* involved a constitutional challenge to a federal statute prohibiting federal employees from receiving honoraria. 513 U.S. at 458-59. *Arndt*, a case arising out of the notorious JonBenet Ramsey murder investigation, provides a more appropriate analogy because it involved, as here, a "gag order" imposed by a superior prohibiting employees' prospective speech. Specifically, in *Arndt*, police officers like plaintiff were ordered not to speak to the media about the Ramsey case, which Ms. Arndt claimed prevented her from defending herself against media charges that she and other officers had mishandled the case. According to Arndt, given the intense media coverage of the case, her desire to set the record straight as to her conduct in the investigation was a matter of public concern that the chief's "gag order" unconstitutionally restrained. The Tenth Circuit disagreed, applying the *Pickering* test and concluding Arndt's proposed speech was "clearly" calculated to redress personal grievances and lacked a broader public purpose such that the First Amendment did not protect it against prior restraint. 309 F.3d at 1254-55.

While not necessarily on point, *Arndt* illustrates the high threshold prohibited speech must attain before an employer's "gag order" infringes on that employee's First Amendment rights. Here, we lack even the suggestion in the evidence that Marlatt's warning against "gossip" prevented Dillon from speaking not as an employee about personal grievances, but as a citizen about matters of public concern. *See Arndt*, 309 F.3d at 1252. Even if it had, however, I determine as a matter of law that a prohibition against "gossip" cannot support a First Amendment prior restraint claim and does not trigger the

4

*Pickering* balancing test.

"Gossip" is defined consistently in every dictionary I have consulted in terms, such as these from the *Random House Unabridged Dictionary* (2d ed. 1993), as "idle talk" or "rumor," "especially about the affairs of others." I decline the invitation to declare speech defined specifically in terms of its personal, unsubstantive nature as falling within that sphere of speech that an employer cannot constitutionally restrain, even if Dillon had been able to establish that she was, in fact, so restrained.

During the course of briefing on the Academy's Supplemental Motion, Dillon expanded her prior restraint claim to assert the Academy's Code of Conduct – which provides that employees "refrain from actions or behavior harmful/hurtful to others at this school, including malicious gossip and similar activities" – was unconstitutionally vague. In somewhat exaggerated style at oral argument, counsel for Plaintiffs characterized this provision as a "total ban" on potentially "all" school related speech so sweeping that it cannot survive scrutiny under *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964). While counsel may disagree, this is not a case that merits an extensive examination of the boundaries of the First Amendment and whether they extend to prohibit all government regulation of prospective speech. The provision is not a "ban,"[1] Dillon concedes no speech of hers was chilled as a result of it, and the analogy between professional codes of

---

[1] In fact, the Code expressly provides that "persons who cannot in good conscience comply with" its provisions "as consistent with state and federal law, are granted a 10 day grace period to express their concerns in writing to the [Board] for consideration." *See* Defs.' Ex. 1, Attachment E, Code of Conduct.

conduct prescribing expectations of speech and criminal or civil liability punishing it is inapt. Teachers' First Amendment free speech rights are not absolute, and are subject to competing interests which may support federal regulation. *See e.g.* Family Educational Rights and Privacy Act of 1974 (FERPA)(federal statute proscribing the disclosure or dissemination of virtually all student education records). Dillon neither acknowledges this reality nor offers a reason why the Code's suggestion that teachers refrain from hurtful conduct such as "malicious gossip" somehow falls outside the parameters of appropriate regulation. Finally, it is unclear what relief Dillon seeks as a result of this argument. *New York Times* provides a basis, perhaps, for declaring the Code provision unconstitutional, but it does not, without any allegation of injury, provide a basis for relief under 42 U.S.C. § 1983.

Dillon's First Amendment prior restraint claims fail as a matter of law and provide no additional or alternative basis for her § 1983 claims.

2. <u>Municipal Liability – Academy and/or School District</u>.

Based on the Tenth Circuit's decision and the evidence the panel deemed supportive of an inference that the Academy board's decision not to renew Dillon's employment contract was motivated, at least in part, by her actions in exercising her First Amendment rights both to speak and to associate freely with colleagues on four matters of public concern, Defendants' Motions for Summary Judgment are DENIED to the extent they argue Dillon has failed to support a viable theory of First Amendment retaliation against them. Academy board member Kathy Seitz testified that other board

members and Academy acting administrator Ivan Adams made statements indicating Dillon's association with disgruntled teachers was a reason her contract was not renewed, and Adams's written evaluation of Dillon expressed concern that Dillon had "been vocal and demonstrative against Board policies, practices and the actual operation of the school." While the Academy presented evidence that poor job performance and lack of professionalism motivated its non-renewal decision, it is for a jury to decide whether the Academy would have made that decision but for Dillon's actions engaging in arguably protected activity.

However, and while the Academy may be held municipally liable for any constitutional deprivation ultimately ascribed to its Board of Directors, *see Pembaur v. City of Cincinnati*, 475 U.S. 469, 480-81 (1986),[2] the District may not. Municipal policymaking authority lies where the applicable law puts it, and it is clear that under Colorado law, the Academy was given exclusive authority to act independently of the District in contracting for services and on personnel matters. C.R.S. § 22-30.5-104(7)(a) ("A Charter school shall be responsible for its own operation including, but not limited to, preparation of a budget, contracting for services, facilities, and personnel matters."). Also the Academy's charter provides that the Academy "will be governed by a seven-member Board of Directors, which has complete responsibility for running the school." Pls.' Ex.

---

[2] The facts presented support at least an inference that the Academy's Board of Directors factored in Dillon's "vocal and demonstrative" conduct and her support for the disgruntled (Brammer-Hoelter) teachers in determining not to renew her contract and, as exclusive and final policymakers for the Academy, the Academy may be held liable for any deprivation of first amendment rights/retaliation that a jury determines was embodied by its Board's decision.

2, p. 16. The charter provides "[f]urthermore" that the Academy has authority "independently to exercise . . . consistent with federal and state law," power over the selection and compensation of its personnel. *Id.* Because it is the Academy, rather than the District, that had "final authority" under state law to act with respect to the challenged action, municipal liability from the Academy board's acts cannot flow to the District.

Even assuming the Academy were not an independent entity, the facts presented support no inference that the District could be held municipally liable for the acts of the Board under 42 U.S.C. § 1983.[3] At most, Dillon suggests the District is municipally liable for the Academy's actions because it was "aware" of the Academy board's non-renewal decision and was "deliberately indifferent" to its consequences, citing *Canton v. Harris*, 489 U.S. 378, 387-88 (1989). The assertion conflates concepts of supervisor and "failure-to-train" liability, and provides no basis for denying the District's Motion for Summary Judgment.

Municipalities and their supervisory personnel are not liable for civil rights violations caused by their employees or subordinate entities unless the plaintiff demonstrates "'[a]n affirmative link'" between the occurrence of the constitutional deprivation and the "adoption of any plan or policy – express or otherwise – *showing*

---

[3] Local governmental entities are "persons" answerable for discrimination or other constitutional or civil rights injuries under 42 U.S.C. § 1983, but may be called to task only for their own "policies" or firmly entrenched "customs" or practices that violate the constitution, not for the unconstitutional acts of their employees or related entities. *See Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 690-91 (1978) *and City of St. Louis v. Praprotnik*, 485 U.S. 112, 122-23, 127 (1988).

*their authorization or approval of such misconduct.*'" *D.T. by M.T. v. Independent School Dist. No. 16 of Pawnee County*, 894 F.2d 1176, 1187 (10th Cir. 1990)(emphasis original)(quoting *Rizzo v. Goode*, 423 U.S. 362 (1976)). "Awareness" that a deprivation occurred and failing to act is insufficient, without more, to support an inference that a final policymaker "authorized" or "approved" that conduct. *See id.* The "deliberate indifference" standard articulated in *Canton* alters or refines this standard in the unique subcategory of cases where constitutional deprivations resulting from the inadequate training of employees (generally, law enforcement officers) may be deemed the "custom" or "policy" of a municipal entity based on policymakers' knowledge of, and deliberate indifference to, the likelihood such deprivations will continue in the absence of adequate training. In *Canton*, the Supreme Court rejected plaintiff's contention that municipal liability in such cases may be premised solely on proof that inadequate police training resulted in an individual constitutional deprivation, holding instead that "inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." 489 U.S. at 387-88. This standard is not applicable here, where Dillon's injury is not attributed to any failure on the part of the District to train Academy board members or Dr. Marlatt, and, even if it were, could not be premised on the single act of retaliation alleged.

The only "facts" averred by Dillon in support of the District's municipal liability is that she "feel[s] certain that the School reported my firing to the [District] assistant

superintendent or human resources department at the School District Office." Dillon Affid., ¶ 27.  Even suspending, for the sake of argument, the legal determination that the Academy is an independent entity with exclusive authority over hiring and firing decisions, a District official's awareness of a single act of retaliation by the Academy board supports no inference of municipal liability under *Rizzo*.  Here, where the Academy is *not* subordinate to the District as a matter of law and where the Academy has sole and exclusive hiring and firing authority over its employees, the assertion is even further afield.

Based on the foregoing, the St. Vrain Valley School District's Supplemental Motion for Summary Judgment (Doc. 57) is GRANTED, and the Academy's Supplemental Motion for Summary Judgment (Doc. 56) is GRANTED to the extent it seeks summary judgment on Dillon's prior restraint theory of relief and DENIED as to its assertion of nonliability for the putative acts of First Amendment retaliation identified by the Tenth Circuit in its Order and Judgment.  Dillon's claim that the Academy decided not to renew her employment contract in retaliation for her having exercised her protected first amendment rights of free speech and association survives against the Academy only, and shall be set for pretrial conference by separate Minute Order.


Dated June 11, 2008.                              **s/John L. Kane**
                                                  SENIOR U.S. DISTRICT JUDGE